Salvador **URQUIDI** and Guadalupe Alvarado Perez, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 20092.

United States Court of Appeals Ninth Circuit.

Jan. 25, 1967.

Rehearing Denied March 9, 1967.

Donald S. Zinn, San Francisco, Cal., for appellant, Salvador Urquidi.

Marvin W. Friedman, San Francisco, Cal., for appellant, Guadalupe Perez.

Cecil F. Poole, U. S. Atty., John J. Bartko, Asst. U. S. Atty., Sacramento, Cal., for appellee.

Before MADDEN, Judge, Court of Claims, and MERRILL and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Urquidi was convicted on all counts and Perez was convicted on two counts of a six-count indictment charging violation of 21 U.S.C. § 174, sale and concealment of heroin. Urquidi was sentenced to 10 years on each count, concurrent, and Perez to 7 years on each count, concurrent. Both appeal.

Urquidi's sole point is that the court erred in denying his motion to dismiss the indictment because he had been denied a speedy trial. He was indicted, jointly with Perez, on September 15, 1961. He appeared for arraignment on September 18, without counsel. Counsel was appointed, and on September 19, he appeared with counsel. The matter was continued to September 21 for plea. On September 21, it was continued to September 22, on September 22 to September 27 and on September 27 to October 2, when he pled not guilty and demanded a jury. The matter then was continued to October 23 to be set, and again continued to November 6 and to November 20. On that day it was continued to January 16 for trial. On January 15, it was continued to March 13 for trial. On February 26, trial was advanced to March 12; on March 6 it was reset for March 13, when trial began. Counsel withdrew and new counsel was appointed on March 7. On one of the earlier occasions, the continuance was because of the absence of the U. S. Attorney. In every other instance, the continuance was for the convenience of the court. No objection was ever made by counsel.

The motion to dismiss was made on the opening day of trial. Counsel claimed that during the six months that had elapsed, Urquidi, who was in jail, was pressured by government agents to assist them by implicating others dealing in narcotics. No claim was made that the fairness of Urquidi's trial would be affected, that counsel's preparation for trial was hampered, that the testimony of any witness was lost, or that anything else prejudicial occurred by reason of the delay. The trial judge pointed out that during the period in question the court was moving to new quarters, that for part of the time the U. S. Attorney was ill, and that the continuances were almost all for the convenience of the court. He also noted that there had been no prior objection. The motion to dismiss was denied.

■ We find here no deprivation of the constitutional right to a speedy trial in violation of the Sixth Amendment. See United States v. Ewell, 1966, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627; Collins v. United States, 9 Cir. 1946, 157 F.2d 409; Buatte v. United States, 9 Cir. 1965, 350 F.2d 389; Cohen v. United States, 9 Cir., 1966, 366 F.2d 363.

The only contention of Perez that requires full consideration is that the evidence was insufficient to sustain his conviction. There were three sales of heroin in Sacramento by Urquidi to a government informer. All were on the same day, one at about 1:00 P.M., one at about 9:15 P.M., and one at about 11:00 P.M. In each case, the informer was searched, equipped with a Fargo transmitter and recorded money, and taken by the agents to a rendezvous where the transaction occurred.

Before the first sale, the informer made a phone call. He was let out of the agent's car at 9th and K Streets, where he met Urquidi, who asked for the money. The informer handed him something. Urquidi left, the informer was searched, and the money was gone. At 2:10, Urquidi met the informer in a nearby park and stated that he had stashed the stuff in a pizza house at 16th and O Streets. A few minutes later, an agent found the heroin at that address.

The second sale was similar. The informer was let out at Third and L Streets, where he met Urquidi, who asked for the money and told the informer to wait for him at Sixth and L Streets. The informer did, and Urquidi returned to that place and delivered the heroin.

For the third sale, the informer was furnished with money dusted with a fluorescent powder. He was let out at Third and L at about 9:45 P.M., where he met Urquidi pursuant to an arrangement made at the time of the second sale. He handed something to Urquidi, who told the informer that he would have to make a phone call to "the man," and that it would take him a while to pick up "the stuff." Urquidi directed the informer to meet him at Sixth and L at about 11:00 P.M. He went into Reno's bar. A few minutes later, he went into another nearby bar, the El Rinchito, where he stayed about 10 minutes. He then took a taxi to Fifth and Broadway, about fifteen blocks away, and entered a bar called Cahill's Doghouse. At about 10:00 o'clock he had asked Perez, by phone, to meet him there. He sat next to Perez at the bar.

After about half an hour, Urquidi and Perez came out of the bar, got into a 1960 Dodge car, and drove to the corner of Sixth and Capitol. Urquidi left the car and Perez drove away, Urquidi walked one block to Sixth and L and dropped something to the ground. The informer picked it up. Both men were arrested. The informer had the heroin, and Urquidi still had three of the bills that had been furnished to the informer.

The agents returned to the state bureau of narcotics, ascertained, by means of the license number, the name and address of the registered owner of the Dodge, and proceeded to that address. Shortly after, at about 1:00 A.M., Perez arrived in the Dodge and was approached by the officers. They told Perez that they were investigating a felony, and he said he would cooperate. In response to questions, he said that he did not know a man named Urquidi, that he had not been at Cahill's Doghouse the preceding afternoon or evening, and that he had had the car since 2:00 P.M. the previous day. He agreed to go with the officers to the state bureau of narcotics. There, his hands were examined under a fluorescent light, and a spot of fluorescence appeared on the back of his right hand. Perez was unable to offer an explanation. He said that he had changed his clothes. The agents asked if they could see the clothes he had previously worn. He agreed, and the group went to his home. There he produced a pair of khaki pants, which showed fluorescence on the right pocket. At that point, he was arrested.

He was returned to the bureau and shown a photograph of Urquidi. He again denied that he knew Urquidi and that he had been in Cahill's Doghouse. He was then interviewed alone, by Agent Thomas. Part of the conversation, as related by Thomas, is as follows:

"Then I says, 'Have you been at Cahill's Doghouse tonight?' And he said that he did. And then he volunteered, 'But I only showed him where to pick the stuff up.' Then * * *

Q. He said what?

A. 'I only showed him where to pick the stuff up.'

Q. All right.

A. Then I asked him, I says, 'Would you cooperate with us?' And he said, 'What do you want me to do?' And I says 'Do you know how to contact these people?' And he said, 'Those people don't tell you their names or where they live.' And I says, 'Well, do they contact you?' And he said, 'Yes.' At this point I called Agent Yates and Sacramento Police Officer Viegas in the room, and they started asking him questions. And at this point the only alteration in his statement was made, he says, 'I only showed Urquidi where to put the money,' after the three of us were questioning. And Agent Yates says, 'Well, why didn't you admit knowing Urquidi in the first place?' And Perez says,

'Well, I knew he was on parole but I didn't want to get him in any trouble.' "

In response to further questions, Perez said that Urquidi had called him on the phone at about 10:00 o'clock, that he had met Urquidi at Cahill's Doghouse, and that he had there received $20 from Urquidi. He said that Urquidi owed him that money. There was further questioning; we quote the testimony of Agent Yates:

"I said, 'In other words, you met Urquidi and you gave him the stuff and he gave you the money?'

He said, 'No, I didn't give him any stuff. I showed him where to put the money.'

But he wouldn't—he wouldn't elaborate on that.

Q. He wouldn't what?

A. Elaborate. He wouldn't say anything more on that point. Then I said something. 'We'd like to have your cooperation. We'd like to get the connection involved in this.'

Q. What do you mean by 'connection'?

A. The source of supply, the person, whoever it came from originally, where he got it.

Q. Did he ask what you meant by 'connection,' or did he seem to understand?

A. No, sir, he did not ask. He said, 'These people don't give you the names when they come in town.' He just said 'these people.'

Q. Is the word 'connection' used in this sense, a term used in the parlance of narcotic users?

A. Yes, sir.

Q. He then said what?

A. He said, 'These people don't give you the names when they come in town.' And again I don't recall, he said something about they called him, and he said he didn't know their names."

■■ We have held that, in determining the sufficiency of the evidence in a criminal case, the test is "whether 'reasonable minds could find that the evidence excludes every hypothesis but that of guilt.' " Barnard v. United States, 9 Cir., 1965, 342 F.2d 309, 317 and cases there cited. We think that, in this case, and considering only the third sale, the evidence meets that test. It is conceivable that Perez had nothing to do with the narcotic, but the evidence points very strongly to the conclusion that he was the man from whom Urquidi obtained it. There are too many coincidences to make a contrary story equally believable. And when Perez' own contradicting statements, his equivocal denials, and his evident knowledge of the narcotics trade are added to the picture, we think that a jury could easily resolve any reasonable doubt that it might otherwise have had. There is much more here than "guilt by association."

■ Perez also argues: (1) that his arrest was unlawful because made without probable cause, (2) that he was illegally detained after his arrest in violation of Rule 5(a) F.R.Crim.P., and that evidence obtained during his detention is inadmissible, (3) that his right to counsel was violated, citing Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and (4) that evidence against him was obtained as the result of an illegal search and seizure. Not one of these contentions was presented to the trial court. No motion to suppress was made, no evidence was objected to on any of these grounds. Here, no sufficient record was made in support of the contentions now urged. The record that was made is not such as to require an affirmative answer to any of Perez's contentions. We find nothing in the record to require application of the "plain error" rule. (Rule 52(b) F.R. Crim.P. See Billeci v. United States, 9 Cir., 1961, 290 F.2d 628; Ramirez v. United States, 9 Cir., 1961, 294 F.2d 277. Escobedo does not apply; the trial occurred in 1962. Johnson v. State of New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. Prima facie, on the record before us, there appears to have been probable cause to arrest, the

detention does not appear to have violated Rule 5(a), and such search as there was appears to have been consented to by Perez.

Affirmed.